Arlene M. STONE, et al., Plaintiff,

v.

FIRST UNION CORPORATION,
et al., Defendants.

No. 94–6932–CIV.

United States District Court,
S.D. Florida.

July 1, 2003.

Jack Scarola, David J. Sales, Searcy Denney Scarola, Barnhart & Shipley, P.A., West Palm Beach, FL, Brenda J. Carter, Fort Lauderdale, FL, for Plaintiffs.

Robert T. Kofman, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, J. Thomas Kilpatrick, Alston & Bird, Atlanta, GA, for Defendants.

*CORRECTED OMNIBUS ORDER ON PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT; OPT–IN PLAINTIFFS' MOTION TO INTERVENE; DEFENDANTS' MOTION FOR PRESERVATION OF RIGHT TO DEPOSE PLAINTIFFS' EXPERTS; DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; AND ORDER ADOPTING SUPPLEMENTAL REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE*

*(This Order corrects typographical errors in the Court's original Omnibus Order, and does not substantively alter the Court's original Omnibus Order)*

GOLD, District Judge.

THIS CAUSE is before the Court upon several pending motions in the above-captioned matter. On December 9, 2002, Plaintiffs filed a Motion for Leave to Amend Complaint (DE # 1198). On December 23, 2002, Plaintiffs filed their Opt–In Plaintiffs' Motion to Intervene (DE # 1207). Defendants filed a Response (DE # 1243) to both motions on March 24, 2003, and Plaintiffs filed a Reply (DE # 1261) for both motions on May 2, 2003. In addition, Defendants filed a Motion for Preservation of Right to Depose Plaintiffs' Experts in the Event That Opt–In Plaintiffs' Motion for Leave to Amend Complaint or Motion to Intervene is Granted (DE # 1217) on January 31, 2003. Plaintiffs filed a Response (DE # 1226) on February 19, 2003, and Defendants filed a Reply (DE # 1230) on February 27, 2003.

In addition, both parties filed Motions for Summary Judgment. On January 31, 2003, Plaintiffs filed a Motion for Partial Summary Judgment (DE # 1219). Defendants filed a Response (DE # 1229) on February 27, 2003, and Plaintiffs filed a Reply (DE # 1239) on March 21, 2003. Defendants filed a Motion for Partial Summary Judgment (DE # 1228) on February 27, 2003. Plaintiffs filed a Response (DE # 1240) on March 21, 2003, and Defendants filed a Reply (DE # 1247) on March 31, 2003. Oral argument on all these motions was held before the Court on Tuesday, May 20, 2003.

Finally, this cause also came before the Court on the Supplemental Report and Recommendation of U.S. Magistrate Judge Ted E. Bandstra (DE # 1242) concerning Plaintiffs' Supplement to Plaintiffs' February 11, 2002 Appeal of Report and Recommendation on Plaintiffs' Motion for Sanctions for Discovery Abuses (DE # 1112). Plaintiffs filed an Objection to the Supplemental Report on April 8, 2003, and Defendants filed a Response to Plaintiffs' Objection on May 2, 2003. The issues surrounding the Supplemental Report and Recommendation were also addressed at the May 20, 2003 oral argument.

Plaintiff originally filed a Complaint on September 23, 1994 alleging age discrimination in violation of § 16(b) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 216(b) ("FLSA"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq., ("ADEA"), and the age discrimination in employment provisions of Florida Statutes, § 760.10. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. § 1367, supplemental jurisdiction over state law claims.

Having carefully considered the parties' briefs, arguments, and applicable case and statutory law, the Court DENIES, IN PART, GRANTS, IN PART, Plaintiffs' Motion for Leave to Amend, DENIES Opt–In Plaintiffs' Motion to Intervene, DENIES Plaintiffs' Motion for Partial Summary Judgment, DENIES Defendants' Motion for Partial Summary Judgment, and AFFIRMS AND ADOPTS the Magistrate Judge's Supplemental Report and Recommendation.

## I. Background

Plaintiff Arlene M. Stone ("Stone") is a former employee of First Union National Bank of Florida ("FUNB") who sought to represent a class of 160 individuals who are or were employed by FUNB, were at least 40 years old when employed by FUNB, and purportedly were demoted, involuntarily discharged, not rehired, laid-off, or otherwise suffered adverse employment actions due to their age between February 4, 1992 and June 30, 1994. Defendant First Union Corporation ("FTU") is a bank holding company headquartered in Charlotte, North Carolina. At all relevant times, FTU, through a wholly owned subsidiary known as First Union Corporation of Florida, owned the First Union National Bank of Florida, a national bank with offices throughout the State of Florida.[1] FUNB was at all relevant times headquartered in Jacksonville, Florida.

During the period from February, 1992 through June 30, 1994, FUNB acquired assets of nine banks that had failed during the savings and loans debacle of the late 1980s and early 1990s and that had subsequently been seized by federal regulators. Eight of these banks were controlled by the Resolution Trust Corporation ("RTC"), and one was controlled by the Federal Deposit Insurance Corporation ("FDIC"). In two other instances, FUNB acquired institutions through actual mergers or business combinations without any government involvement. Collectively, Plaintiff and the 160 class members she sought to represent were employed by eight of these eleven institutions prior to the FUNB acquisition.

Plaintiff contends that the First Union Defendants designed a scheme, in connection with the acquisitions of assets from failed banks in Florida, to discriminate against the older employees of these acquired institutions in favor of younger employees. Plaintiff contends that the closing of branch offices and operations centers, the failure to hire or the only temporary hiring of the employees who staffed these offices, and the discharge of employees were motivated by discriminatory animus rather than compelling business considerations.

Plaintiff was the manager of Southeast Bank of Florida's ("Southeast") Galt Ocean Mile branch office in Fort Lauderdale, Florida (Broward County), when FUNB acquired Southeast from the FDIC in the fall of 1991.

---

1. Through a series of mergers and name changes in 1997, First Union National Bank of Florida became part of a single consolidated national bank known as First Union National Bank, which is a direct subsidiary of FTU. The acronym FUNB is used in this Order to refer to the now defunct First Union National Bank of Florida.

At the time, Stone was 60 years old and had worked for Southeast and its predecessors since 1969. After the merger, Stone was reassigned, with no reduction in compensation, to an assistant branch manager position in another Southeast branch. Stone was advised that the assistant branch manager position would be eliminated in Broward County as of the October, 1992 conversion date and that her job would therefore end at that time. Stone subsequently posted for other positions, but was not hired for them. In October, 1992, Stone's position was eliminated and her employment was terminated.

On November 30, 1992, Stone filed a charge of age discrimination with the EEOC. In a determination letter dated June 10, 1994, the EEOC dismissed the charge, finding a lack of credible evidence to support the allegations. Plaintiff filed her Complaint in the United States District Court for the Southern District of Florida, alleging age discrimination in violation of the ADEA and Florida law, on September 23, 1994. Defendants sought summary judgment on Plaintiff Stone's individual claims, arguing that Stone's action was untimely and is barred by the statute of limitations established under the ADEA. The Court found by prior Order that there are genuine issues of material fact that preclude the granting of summary judgment on this issue.

At the end of 1998, the Court granted preliminary, conditional certification of an opt-in class in this action. Opt-in class actions on behalf of similarly situated plaintiffs are provided by the opt-in class mechanism under 29 U.S.C. § 216(b). 29 U.S.C. § 216(b) states in relevant part that "An action ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *Id.* Moreover, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.*

§ 216(b) class actions differ from class actions provided by Federal Rule of Civil Procedure 23. "In a Rule 23 class action, each person who falls within the class definition is considered to be a class member and is bound by the judgment, favorable or unfavorable, unless he has opted out. By contrast, a putative plaintiff must affirmatively opt into a § 216(b) action by filing his written consent with the court in order to be considered a class member and be bound by the outcome of the action." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir.2001) (citations omitted).

The Eleventh Circuit Court of Appeals has stated that "[t]o maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are 'similarly situated.'" *Id.* at 1217 (citations omitted). "[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members.'" *Id.* (quoting *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)) (citations omitted). The "'similarly situated requirement' [of § 216(b)] is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Id.* at 1219 (quoting *Grayson*, 79 F.3d at 1095).

In *Hipp*, the Eleventh Circuit provided district courts within the Circuit with valuable guidance in adjudicating motions such as Plaintiffs', stating that "we will clarify the meaning of § 216(b)'s 'similarly situated' requirement in this circuit." *Id.* at 1217. In that case, the Eleventh Circuit suggested that district courts use what was described as a "two-tiered approach in making the similarly situated determination. Under this approach, during the early stages of litigation, the district court would have evaluated the case under a lenient standard and likely would have granted preliminary certification of an opt-in class. The court would then have re-evaluated the similarly situated question at a later stage, once discovery produced more information regarding the nature of Plaintiffs' claims." *Id.* at 1217–18. In discussing the specifics of this two-tiered approach, the *Hipp* court quoted language from *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir.1995), in which the Fifth Circuit stated that "[t]he first determination is made at the so-called 'notice stage.' At

the notice stage, the district court makes a decision—usually based only on the pleadings and any affidavits which have been submitted—whether notice of the action should be given to potential class members." *Id.* at 1218 (quoting *Mooney,* 54 F.3d at 1213–1214). "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class. If the district court 'conditionally certifies' the class, putative class members are given notice and the opportunity to 'opt-in.' The action proceeds as a representative action throughout discovery." *Id.* At the second stage, which is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial," "the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question." *Id.*

The Eleventh Circuit concluded that "[t]he two-tiered approach to certification of § 216(b) opt-in classes described above appears to be an effective tool for district courts to use in managing these often complex cases, and we suggest that district courts in this circuit adopt it in future cases." *Id.* at 1219. The Eleventh Circuit stressed that it was not mandating that the two-tiered approach be adopted, given that "[t]he decision to create an opt-in class under § 216(b), like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Id.* It did, however, endorse the two-tiered approach as an "effective tool" for district courts to use in making their § 216(b) determinations. *Id.*

Applying the Eleventh Circuit's approach to this case, the Court in September, 2001 applied the two-tiered approach in § 216(b) certification endorsed by *Hipp* based on a "preliminary, conditional certification at the notice stage of the case using a fairly lenient standard, and a second, more rigorous factual determination on the similarly situated question after a motion for decertification by the defendant." *Stone v. First Union Corp., et al.,* 203 F.R.D. 532, 536 (S.D.Fla.2001) ("*Stone I*") (citation omitted). In *Stone I,*

the Court granted preliminary certification to current and former employees of Defendant alleging age discrimination finding that "Plaintiff Stone's charge provided adequate notice of class claims, and that it could therefore properly serve as the representative charge." *Id.* at 537. The Court stated that "[w]hile the [EEOC] charge and [Plaintiff Stone's accompanying] affidavit fall short of a direct allegation of class-wide discrimination, they do provide notice that individuals other than Plaintiff were affected by Defendants' actions." *Id.* (citation omitted). Subsequent to the Court's preliminary certification, Defendants requested the Court to revisit its preliminary certification and the Court thus conducted the second, more rigorous determination of the *Hipp* two-tier process on the similarly situated question. Applying the Eleventh Circuit's holdings in *Grayson* and *Hipp* to the facts of this case as part of that more rigorous determination, the Court noted that "the factors in *Grayson* and *Hipp* to assist" in the similarly situated analysis include:

(1) whether the [P]laintiffs all held the same job titles; (2) whether the [P]laintiffs worked in different geographical locations; (3) the extent to which the claimed discrimination occurred during different time periods and by different decision makers; (4) whether [P]laintiffs have provided "statistically significant" evidence of age discrimination; (5) whether the Plaintiffs all alleged similar, though not identical, discriminatory treatment; (6) whether the [P]laintiffs have sufficiently pled and supported by affidavits, depositions, and the like that Defendant's decision makers have articulated and manifested a clear intent to purge the Defendant of older employees; and (7) whether the Defendant took steps to implement its plan, such as by targeting older employees for criticism and building a "paper trail" that would be grounds for their demotion. Obviously, each case must be reviewed on its pertinent facts to determine whether these, or other factors, are relevant to measure the degree of "similarity."

*Id.* at 542–43 (internal quotations and citations omitted).

Applying these and other factors to the Plaintiffs in *Stone I*, the Court decertified the class at the second stage of the *Hipp* two-tier analysis, concluding that "maintenance of an ADEA collective action involving Plaintiff Stone and all 160 opt-in [P]laintiffs is inappropriate under the facts of this case. The proposed opt-in class mixes employees with different job titles and from all levels of the organization; includes individuals employed within different divisions of the bank; includes individuals who assert a variety of claims, many of which have not been asserted by the representative Plaintiff; and fails to provide evidence of the application of an overriding discriminatory policy, practice, or procedure." *Id.* at 543.

On February 11, 2002, the Court denied Plaintiffs' Motion to Reconsider Decertification. The Court subsequently granted Plaintiffs' Motion to Amend the Orders, and has stayed the decertification provisions pending the adjudication of Plaintiffs' Motion to Amend Complaint and Opt–In Plaintiffs' Motion to Intervene, both of which are addressed in this Order.

## II. Applicable Standard

When the time period for filing an amendment of a pleading as of right has expired, Rule 15(a) of the Federal Rules of Civil Procedure requires that amendment may be provided "only by leave of court or by written consent of the adverse party." Fed. R.Civ.P. 15(a). The Eleventh Circuit has held that motions for leave to amend complaints should be liberally granted when necessary in the interests of justice. *See Jennings v. BIC Corp.*, 181 F.3d 1250, 1258 (11th Cir.1999) (stating that "leave to amend should be liberally granted when necessary in the interest of justice" under Fed.R.Civ.P. 15(a)); *Florida Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1520 (11th Cir.1996) ("Unless substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial.") (citing *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989)).

Interpreting Fed.R.Civ.P. 15(a), the U.S. Supreme Court stated in *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962):

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought, as the rules require, be "freely given." *Id.*

Having reviewed the parties' arguments and applicable case law, the Court concludes that the dispositive question in determining whether Plaintiffs shall be granted leave to amend is whether any such amendment would be futile. If any amendment would be futile, the Court will deny Plaintiff's Motion for Leave to Amend.

## III. Analysis

### (A) Plaintiffs' Motion for Leave to Amend Complaint

In their Motion for Leave to Amend Complaint, Plaintiffs note that the Court granted Defendants' Motion to Decertify in September, 2001 and denied Plaintiffs' Motion to Reconsider Decertification in February, 2001, but argue that new developments have taken place since those Orders. Plaintiffs state that since the September 4, 2001 Order, more than 130 Opt–In Plaintiffs have filed individual charges of age discrimination with the EEOC and received their right-to-sue letters. Plaintiffs also argue that they now have "major additional new evidence. Principally, Plaintiffs now have the benefit of expert reports supporting the similarity of their injuries when First Union acquired their banking institutions, the pervasiveness of age discrimination in a variety of terms and conditions of employment at First Union, and supporting their common allegations that First Union willfully engaged in a pattern and practice of age discrimination when it acquired banking institutions in Florida during 1991 to 1994."

Because these expert reports purportedly "demonstrate the systemic pattern and practice of rampant age discrimination," Plaintiffs argue that they should be permitted leave to

amend their Complaint to add all Opt–In Plaintiffs "so that they can proceed collectively and have their common questions of law and fact adjudicated in the most cost-effective and efficient manner, as authorized by 29 U.S.C. § 216(b)." Second, Plaintiffs request leave to add Wachovia as a Defendant given that Defendant First Union Corporation merged with Wachovia Corporation in September, 2001.

### (i) Applicable Rules and Standards

While it is difficult to decipher the exact parameters of Plaintiffs' argument in their Motion for Leave to Amend, Plaintiffs cite (1) § 216(b), the statute governing opt-in classes addressed in the Court's Order decertifying the class; (2) Fed.R.Civ.P. 23, the class action statute in the Federal Rules of Civil Procedure; and (3) joinder, which is governed by Fed.R.Civ.P. 20, as bases for Plaintiffs to move forward collectively if the Motion for Leave to Amend is granted. Because Plaintiffs argue that there is precedent for courts to reevaluate a decertification order "in light of new or changing circumstances," it is first helpful to review in greater detail what the Court concluded in its September 4, 2001 Order decertifying the class.

As noted above, the Court concluded that decertification was appropriate, after granting preliminary, conditional certification pursuant to 216(b), because the class members brought numerous different types of claims that relate to several different mergers and acquisitions involving different entities and institutions, were employed in different branches and divisions under several different job titles and classifications, and failed to show any evidence of a pattern or practice of age discrimination to which they were all subjected.

Specifically, the Court determined that "[b]efore considering the propriety of issuing final class certification in this case, it is nec-essary to set forth the standard to be applied in the Eleventh Circuit concerning 'similarly situated' class plaintiffs under 29 U.S.C. § 216(b)." *Stone,* 203 F.R.D. at 540. The Court noted that the two most significant Eleventh Circuit cases in this regard are *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208 (11th Cir.2001) and *Grayson v. K Mart Corp.,* 79 F.3d 1086 (11th Cir.1996). The Court noted that the Eleventh Circuit in both *Grayson* and *Hipp* has held that "the 'similarly situated' requirement [for § 216(b)] is more elastic and less stringent than the requirements found in Fed.R.Civ.P. 20 (joinder) and Fed.R.Civ.P. 42 (severance)." *Id.* In the September, 2001 Order, the Court subsequently took the next step to determine how much less stringent the requirements for § 216(b) are in practice.

In doing so, the Court first considered joinder under Rule 20 to determine what it required.[2] "A party seeking joinder of claimants under Rule 20 must establish two prerequisites: (1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and (2) some question of law or fact common to *all* persons seeking to be joined." *Id.* at 541 (emphasis original) (citing *Alexander v. Fulton County,* 207 F.3d 1303, 1323 (11th Cir.2000)). Moreover, "[i]n determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts treat the term transaction flexibly." *Id.* (citing *Alexander,* 207 F.3d at 1323). The second prong of Rule 20 "does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties." *Id.* (citations omitted). Given that the requirements for Rule 20 are more stringent than those under 216(b), the Court concluded that plaintiffs may be similarly situated under 216(b) "even if the transactions or occurrences are not identical." *Id.* "Moreover, by implication, not all questions of law or fact must be common; rather, it is

---

2. Fed.R.Civ.P. 20 provides: All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action .... A plaintiff or defendant need not be interested in obtaining or defending against the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

enough if some questions of law or fact are common to all parties, even if such questions do not predominate." *Id.*

In addition to addressing the relationship between 216(b) and joinder under Rule 20, the Court also addressed Fed.R.Civ.P. 23, the rule governing class actions under the Federal Rules of Civil Procedure. The Court noted that in *Grayson,* the Eleventh Circuit quoted a case stating "[t]he 'similarly situated' requirement [under 216(b) ], in turn, is considerably less stringent than the requirement of [Rule 23(b)(3) ] that common questions 'predominate,' or, presumably, the Rule 20(a) requirement that claims 'arise out of the same action or occurrence.'" *Id.* (citing *Grayson,* 79 F.3d at 1096) (citation omitted).[3, 4] The Court noted that Defendants in this case "have adhered to the position that the term 'similarly situated,' as incorporated into the ADEA, is defined by the class action standards under Fed.R.Civ.P. 23." *Id.* The Court, however, stated that "[w]hile aspects of Defendants' proposed Rule 23 analysis are compelling, *Grayson* nonetheless has made it clear that the requirements for satisfying Rule 23 are considerably more involved than the unitary similarly situated requirements of § 216(b)." *Id.* at 541–542.

Moreover, the Eleventh Circuit explained in *Grayson* that "[i]n creating a collective action procedure for ADEA actions, Congress clearly adopted the opt-in joinder procedure of § 216(b) of the FLSA and thus impliedly rejected the Rule 23 class action

procedures applicable to Title VII actions." *Id.* at 542 (citing *Grayson,* 79 F.3d at 1106).

Summing up the Court's conclusions regarding the applicable standard for a putative collective action in this case, the Court stated in its September, 2001 Order that the "Eleventh Circuit's viewpoint in *Grayson* is not limited to the difference between 'opt-in' versus 'opt-out' procedures, but addresses, as well, the underlying criteria as to when an ADEA collective action versus a Rule 23 class action is permitted." *Id.* Specifically, "[t]he Court concurs with the Plaintiffs that the Rule 23 standard is inapplicable with regard to whether a § 216(b) collective action should be permitted, and that the applicable standard is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Id.* In addition, "[g]iven the clear holdings on this issue set forth in *Grayson* and *Hipp,* it does not logically follow, as Defendants suggest, that a more stringent standard (i.e. Rule 23) should apply when the Rule 20 and 42 criteria, being less stringent [than the Rule 23 standard], do not." *Id.*[5]

Despite the Court's conclusion, based on Eleventh Circuit case law, that (1) the opt-in joinder procedure of § 216(b) of the FLSA is applicable to putative collective actions under the ADEA; and (2) that the standards for joinder under Rule 20 and for class actions under Rule 23, though not applicable to this case, are more stringent than the § 216(b) standard, Plaintiffs now cite joinder and the Rule 23 class action procedure as applicable

**3.** In *Grayson,* the Eleventh Circuit also stated that "[a]lthough not at issue in this case, it is clear that the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure." *Id.* at n. 12 (citing *LaChapelle v. Owens–Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir. 1975) (Rule 23 and § 216(b) actions are "mutually exclusive and irreconcilable")).

**4.** All Fifth Circuit decisions prior to October 1, 1981 are binding precedent on Eleventh Circuit courts. *See Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**5.** The Court notes that while *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228 (11th Cir.2000) involved a non-employment discrimination civil rights class action under Fed.R.Civ.P.

23(b)(3) and is thus different from this case, the Eleventh Circuit did make certain observations in that case regarding the manageability of a large putative class such as this that necessarily relies on case-specific inquiries. In that case, the Eleventh Circuit first noted that plaintiffs "argue that the issue of whether Avis maintains a policy or practice of discrimination predominates over all the legal and factual questions affecting only individual members of the class." *Id.* at 1235 (citations omitted). Next, the Eleventh Circuit noted that "serious drawbacks to the maintenance of a class action are presented where initial determinations ... turn upon highly individualized facts." *Id.* at 1235–1236 (citations omitted). The Court notes that many of these same issues regarding maintenance of a class action also exist in this case where the issues turn upon investigation of case-specific and individualized facts.

to this case and essentially argue that the facts of this case meet the more stringent requirements for collective action under the rules governing joinder and class actions under Rule 23, as well as the requirements under § 216(b).[6]

Having discussed in the September, 2001 Order the applicable procedure (the class action procedure found in § 216(b) of the FLSA) and the applicable standard for determining whether Plaintiffs were "similarly situated," the Court applied the procedure and standards to the facts of this case. As described earlier, the Court noted that the factors enunciated in *Grayson* and *Hipp* by the Eleventh Circuit to assist in this analysis include: (1) whether the Plaintiffs all held the same job titles; (2) whether the Plaintiffs worked in different geographical locations; (3) the extent to which the claimed discrimination occurred during different time periods and by different decision makers; (4) whether the Plaintiffs have provided "statistically significant" evidence of age discrimination; (5) whether the Plaintiffs all alleged similar, though not identical, discriminatory treatment; (6) whether the Plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that Defendants' decision makers have articulated and manifested a clear intent to purge the Defendant of older employees; and (7) whether the Defendant took steps to implement its plan, such as targeting older employees for criticism and creating a paper trail that would be grounds for their demotion. *See id.* at 543.

Applying these factors, the Court determined that it was appropriate to decertify the class concluding that "maintenance of an ADEA collective action involving Plaintiff Stone and all 160 opt-in [P]laintiffs is inappropriate under the facts of this case. The proposed opt-in class mixes employees with different job titles and from all levels of the organization; includes individuals employed within different divisions of the bank; includes individuals who assert a variety of claims, many of which have not been asserted by the representative Plaintiff; and fails to

provide evidence of the application of an overriding discriminatory policy, practice, or procedure." *Id.* at 543.

■ Having reviewed Plaintiffs' arguments, the Court concludes that Plaintiffs have presented no persuasive authority to reverse the Court's earlier conclusion that the § 216(b) opt-in class procedure is the appropriate mechanism for determining whether a collective action such as this can proceed under the ADEA. Moreover, if Plaintiffs cannot meet the applicable standard under § 216(b) for class certification, Plaintiffs will necessarily not be able to meet the more stringent standards for joinder under Fed.R.Civ.P. 20 or class action certification under Fed.R.Civ.P. 23. Thus, the Court concludes that the question remaining in the adjudication of Plaintiffs' Motion for Leave to Amend is as follows: whether the new developments cited by Plaintiffs, specifically the new expert reports it has filed and the fact that since the September, 2001 Order more than 130 Opt–In Plaintiffs have filed individual charges of age discrimination and received their right-to-sue letters, justify granting Plaintiffs leave to amend their Complaint in the hope that they can now meet the certification standard under the second stage of the § 216(b) class certification process. If not, Plaintiffs' amendment would be futile, and the Court would be compelled to deny leave to amend.

**(ii) Whether Change in Circumstances Exists Sufficient to Allow Action to Move Forward Collectively**

■ Having reviewed Plaintiffs' briefs, arguments, and the expert reports they filed in support of their arguments, the Court concludes that Plaintiffs cannot meet the requirements for class certification under § 216(b), and thus cannot meet the requirements for joinder under Rule 20 or class certification under Rule 23 either. As such, granting Plaintiffs leave to amend their Complaint would be futile.

---

6. The Court notes that it is difficult to determine from the briefs the extent to which Plaintiffs are relying on 216(b), Rule 20, and Rule 23 in their argument that this action should proceed collec-tively. In this Order, the Court addresses all three rules in determining whether Plaintiff's amendment would be futile.

Plaintiffs argue that the "major additional new evidence" they have filed with the Court, consisting "principally" of expert reports, creates a change in circumstances sufficient for the Court to now allow Plaintiffs to move forward collectively despite the Court's Orders granting Defendants' Motion to Decertify in 2001 and denying Plaintiffs' Motion for Reconsideration in 2002. Plaintiffs begin their summary of their "major additional new evidence" by describing Plaintiffs and arguing that their claims and situations are similar. Among the evidence cited, Plaintiffs state *inter alia* that "100% of Plaintiffs were victims of rampant unchecked age discrimination that permeated the First Union organization," "100% of Plaintiffs were acquired by First Union during its takeovers of banking institutions in Florida between August 1991 and April 1994 and were age forty or older at the time of acquisition," "100% of Opt–In Plaintiffs allege at least one adverse employment action that is the same as that complained of by Ms. Stone," "93% of Opt–In Plaintiffs are claiming termination as an adverse action, as is Ms. Stone," and "93.2% of Plaintiffs were employed with banking institutions that were acquired by First Union during the six-month period between August 1991 and March 1992."

### (a) The Expert Reports

Plaintiffs filed several expert reports in support of their motion, including reports by: Richard Drogin, Ph.D., Emeritus Professor in the Department of Statistics at California State University–Hayward; H. John Bernardin, Ph.D., and Peter Villanova, Ph.D., College of Business at Florida Atlantic University and Department of Management at Appalachian State University, respectively; Helen Dennis, self-employed specialist on aging, employment and retirement; Kathleen K. Lundquist, Ph.D., President of Applied Psychological Techniques, Inc.; and M. Victor Janulaitis, a management consultant.

The Court has reviewed the reports and the findings contained therein, and provides the following brief summaries of each of the above-specified reports.

Dr. Drogin concludes that: "[O]lder employees were disproportionately terminated .... The z-values for these analyses ranged from 3.16 to 18.1 standard deviations, which correspond to probabilities of less than one chance in 500 and less than 1 chance in 10 to the 50th power, respectively. Disparities as large as those observed in this case are practically impossible to occur by random fluctuation." (Drogin 9).

Drs. Bernardin and Villanova concluded that "[t]hese results support plaintiffs' allegations of age discrimination in termination decisions" and "do not support the validity of the processes claimed by FUNB representatives to be used in decisions to retain or terminate employees from the acquired institutions." (Bernardin 28). They also stated that the "series of analyses we reported in this document repeatedly support the allegation of age-related bias being manifest in a wide variety of employment decisions at First Union during the 2–year period immediately subsequent to the acquisition of large institutional competitors." (*Id.* at 68). The statistical results they reference include the following: "only 19% of workers younger than 40 were involuntary layoffs, while ... 25.6% of those 40–49 were involuntary layoffs ... 28.4% of those 50–59 were involuntary layoffs ... 35.1% of workers over 60 were involuntary layoffs."

In his report, Janulaitis concluded that "older employees had a significantly greater chance than younger employees to end their employment with First Union by being involuntarily terminated" and that the average age of First Union's Florida workforce was significantly younger than the Florida non-agricultural labor force during the relevant time period. (Janulaitis 16).

Dr. Lundquist examined First Union's "selection/displacement processes" and concluded that the process for making merger selection decisions was "ill-conceived, inconsistently applied and lacking in validity" and "[t]his method of making selection decisions was flawed, without appropriate standardization or sufficient controls, thus opening up the decisionmaking process to non job-related factors, including intentional bias against older individuals." (Lundquist 12, 27).

Dennis, "an expert in age stereotyping," cited a former advisor to President Carter in declaring that "discrimination against older people is more ingrained in American minds than racism or sexism." (Dennis 9). After examining First Union, Dennis concluded that "[c]onditions existed that were breeding grounds for age stereotyping," "[d]ecision makers expressed little awareness, knowledge or concern about age-related stereotypes," and that the "First Union culture valued characteristics often associated with young as opposed to older workers." (*Id.* at 5–6).

In their Response, Defendants argue that the only thing new in the Opt–In Plaintiffs' Motions for Leave to Amend and to Intervene is their argument that submission of the expert reports in August, 2002 constitutes "major additional new evidence." Defendants conclude that the expert reports are not probative, and do not "overshadow the vast situational dissimilarities of the 160 persons who seek to enter the case through the back door after the front door was slammed shut." Defendants note that the Court stated in its decertification order that statistical proof is only one subfactor in analyzing whether a discriminatory plan exists, which is in turn only one factor in determining whether Opt–In Plaintiffs are similarly situated. They argue that while Plaintiffs assert that "the grounds for the September 4, 2001 decertification order were primarily that Plaintiffs had failed to prove that there was a pattern or practice of age discrimination at First Union during the subject acquisitions . . . and had failed to submit expert reports," in reality the "lack of expert reports was not the reason for decertification and the presence of those reports does not now magically make individuals 'similarly situated' under § 216(b)." Defendants state that the existence or non-existence of expert reports was a subpart of 1 of the 5 factors applied by the Court—whether there was evidence to support a pattern or practice of discrimination. Moreover, they assert that the Court merely pointed out the fact that Plaintiffs did not present statistical evidence, and then went on to discuss the other pattern and practice factors that precluded class certification.

· Next, Defendants assert that the reports are contrary to Plaintiffs' assertion of the existence of a plan to discriminate against older persons, and "they further bolster the conclusion that the Opt–In Plaintiffs are not similarly situated." Defendants criticize each of the reports as suffering from "serious flaws."

Defendants criticize the report by Drs. Barnardin and Villanova stating that "their analysis was admittedly not designed to evaluate the actual decision making process at First Union for each merger or acquisition that occurred during the time period identified by the Court." Defendants cite the report as stating the Drs. "essentially test[ed] the decision-making processes at an aggregated level that does not replicate the actual process of decision making." (Barnardin 28). In light of this, Defendants argue that the report is not probative stating it is elementary that for statistical analysis to be of any probative value whatsoever, it must mirror the actual process challenged. *See Eastland v. Tennessee Valley Auth.*, 704 F.2d 613, 623 (11th Cir.1983) (noting that the "probative value of a regression analysis depends in part upon the inclusion of all major variables likely to have a large effect on the dependent variable") (citation omitted); *Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1327–1328 (11th Cir.2000) (noting in a hiring and promotion context that the statistical evidence must be finely tuned to compare the employer's workforce with the qualified populations in the relevant labor market); *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir.1997) ("[S]tatistics without an analytic foundation are 'virtually meaningless.' ") (citations omitted).

Defendants take Dennis' report to task for failing to set forth an opinion on critical issues, as when she stated that "[s]ince there were fewer forms and written comments compared to the documents reviewed in the *Hyman* case, I have no opinion regarding the decision-making process and the extent to which it was or was not influenced by age stereotyping." (Dennis 23).

Defendants also argue that the experts take contradictory positions. As an example, they state that Dr. Drogin and Janulaitis

included the termination code for early retirement in their analyses of involuntary terminations, while Drs. Barnardin and Villanova excluded early retirement from their analyses of layoff rates. (Drogin 5; Janulaitis 17 n. 4; Barnardin 5–6). Defendants assert that the reports also lack probative value because in some cases the underlying data used to produce a particular analysis "is fraught with inconsistencies that restrict its analytical use." As an example, Defendants cite the "job families" created by Janulaitis, stating that Janulaitis "apparently arbitrarily included job titles in some of his job families in one year and then included the exact same job title in an entirely different job family the next year." (Haworth Decl. 9). Defendants state that this also limits the probative values of the reports produced by Dr. Drogin, which they claim is based upon Janulaitis' job family groupings.

Finally, Defendants state that Dr. Lundquist's report fails to support the Opt–In Plaintiffs' claims that they were subjected to the same discriminatory policy. In fact, according to Defendants, the report supports Defendants' position that the Opt–In Plaintiffs are so dissimilar that they should not proceed collectively, citing Dr. Lundquist's observation on p. 25 of the report that employees were evaluated differently for different positions.

Defendants cite the work of their expert, Dr. Joan Haworth, who analyzed the methodology used by Plaintiffs' experts and concluded that the aggregate analyses conducted by Drs. Drogin, Barnardin, and Villanova do not address any actual decision-making process that affected individual employees at First Union. Dr. Haworth conducted her own analysis of the back-up data provided by Dr. Drogin, and concluded that for Dr. Drogin's branch manager job families at Southeast Bank there are not statistically significant differences in involuntary layoffs between employees over and under the age of 40. (Haworth 15–16). When Dr. Haworth conducted the same type of involuntary termination analysis as Dr. Drogin (controlling for bank and job family), but accounted for the employee's "responsibility center" (the department in which the employee worked and

the level at which most of the decisions were made), she concluded that the involuntary layoff decision process at Southeast (Plaintiff Stone was included in the one of the Southeast job families), as well as all other banks except for Jacksonville Federal, was age-neutral and not statistically significant. (Id. at 20–21). In sum, Defendants argue that Plaintiffs' expert reports do not constitute the "major new additional evidence" claimed by Plaintiffs, that the reports are not probative or persuasive in regards to Plaintiffs' arguments, that Plaintiffs' reports are flawed, and that Plaintiffs' reports, if anything, support the Court's earlier conclusion that Plaintiffs should not be able to move forward collectively.

**(b) Application of New Evidence/Expert Reports to Facts of This Case**

Applying Plaintiffs' purported new evidence to the facts of this case, the Court notes that Plaintiffs apparently filed their expert reports in the belief that providing statistical support for their allegations would allow them to reverse the Court's conclusion in its September, 2001 Order decertifying the class. This becomes clear in Plaintiffs' Reply, in which they state "the fact is that judging by the number of times their absence was mentioned in the opinion, the Court apparently weighted the factor of experts' reports much more heavily than the other factors." The Court does not agree with Plaintiffs that this inference may be drawn from its September, 2001 opinion. The Court notes, however, that Defendants are correct that the existence or non-existence of expert reports was a subpart of the analysis performed by the Court, and that any lack of statistical support was not the primary reason for decertification. As the Court stated in weighing the factors considered in the second stage of the § 216(b) certification process, "[t]aken as a whole, the factors set forth above and described in greater detail below weigh heavily in favor of decertifying the subject class." *Stone*, 203 F.R.D. at 543 (emphasis added).

In the September, 2001 Order, the Court first examined the types and numbers of acquisitions at issue. The Court noted that

Plaintiff and Opt–In Plaintiffs were employed by banking institutions acquired by First Union "in at least eight different mergers and acquisitions that occurred throughout Florida during several years." *Id.* "These transactions varied in a number of significant ways.... Furthermore, the different types of transactions went through different stages and processes." *Id.* at 543–44. The "new evidence" provided by Plaintiffs does not change the Court's analysis in this regard. Regardless of Plaintiffs' attempts to provide percentage figures claiming that Plaintiffs' claims are identical or similar, these studies do not alter the underlying fact that the transactions at issue varied in significant ways and that the different types of transactions went through different stages and processes. In its earlier Order, the Court noted that Plaintiffs have not presented persuasive, binding, on-point case law where courts have upheld collective actions that involve the degree of diversity in the number or type of transactions out of which the alleged discriminatory practice grew. For example, *Grayson* "stemmed from the implementation of a new policy, termed the 'Renewal Program,' that was targeted towards replacing older managers with younger managers in K Mart's Southern Region, and that was instituted in 1987 when Joseph Antonini became President, CEO, and Chairman of K Mart." *Id.* at 544 (citing *Grayson*, 79 F.3d at 1091). The *Hyman* case, which Plaintiffs have relied on in these proceedings, "concerned only two reductions in force ('RIF') that were directly tied to the defendant's takeover of a single banking institution." *Id.* (citing *Hyman v. First Union Corp.*, 982 F.Supp. 1, 3–4 (D.D.C.1997)).

Next, the Court considered the varying job titles of Opt–In Plaintiffs. The Court concluded that the "class of Stone and 160 Opt–In Plaintiffs mixes exempt [under the FLSA] high level managers, mid-managers, and first line supervisors with nonexempt clerical, technical, and administrative employees." *Id.* at 544. The Court noted that "both *Grayson* and *Hipp* are notable for their certification of a far more limited group of employee types." *Id.* at 545. Apparently in response to the Court's findings on this issue, Plaintiffs included in their Motion for Leave

to Amend a section entitled "Description of Plaintiffs" in which Plaintiffs assign percentile values to descriptions of the Plaintiffs in an attempt to show their similarity. For example, Plaintiffs state "100% of Plaintiffs were victims of the rampant unchecked age discrimination that permeated the First Union organization and decimated the ranks of acquired employees forty years or older," "93.2% of Plaintiffs were employed with banking institutions that were acquired by First Union during the six-month period between August 1991 and March 1992," and "90.1% of Plaintiffs were employed with the same three banking institutions acquired by First Union." Without commenting on the reliability of these percentile values, the Court concludes upon review of these purported statistics that they do not alter the Court's conclusion in its September, 2001 Order that the types and numbers of acquisitions at issue and the diversity of job titles, while not dispositive standing alone, weigh in favor of decertification of the class.

Likewise, Plaintiffs' attempts to assign percentile values to descriptions of the types of claims they are bringing is unavailing. For example, Plaintiffs state that "100% of Opt–In Plaintiffs allege at least one adverse employment action that is the same as that complained of by Ms. Stone." This statement does not change the Court's earlier observation, however, that "the alleged personnel actions upon which the class members base their complaints are too diverse to support a collective action of 'similarly situated' individuals." *Id.* at 546. The Court noted that the adverse actions alleged by class members include: (a) involuntary termination; (b) involuntary demotion without a pay cut; (c) involuntary demotion with a pay cut; (d) involuntary transfer and/or relocation; (e) failure to hire (at the time of acquisition); (f) failure to reassign or transfer after job elimination; (g) failure to promote; (h) failure to train; (i) constructive termination; (j) failure to pay allegedly owed bonuses or vacation pay; (k) failure to communicate personnel decisions privately; (*l*) harassment (hostile environment); (m) change in job title; and (n) failure to bring up to FUNB pay scale immediately. *See id.*

Upon review of Plaintiffs' expert reports and purported statistics, the Court concludes that nothing Plaintiffs have presented alters the Court's earlier conclusion that this factor also weighs in favor of decertification.

Perhaps the most significant factor precluding collective action in this matter is Plaintiffs' failure to sufficiently establish pattern or practice evidence of class-wide discrimination. As the Court stated in its September, 2001 Order, "despite extensive discovery, Plaintiff has not 'put forth substantial evidence that the proposed class members were the victims of a single decision, policy, or plan infected by discrimination.'" *Id.* at 547 (quoting *Brooks v. Bell-South Telecomms., Inc.,* 164 F.R.D. 561, 566 (N.D.Ala.1995)). In their most recent motions, Plaintiffs rely on many of the same arguments they have already made over the course of this action, such as arguments relying on Defendants' college recruiting program as part of their purported attempts to establish an alleged plan on the part of Defendants to create a younger workforce. In its earlier Order, the Court noted that "Plaintiffs' attempts to create evidence that the Defendants had a systematic plan to create a younger workforce out of the fact that they had this college recruiting program are unavailing." *Id.* at 549. Moreover, the Court concluded that statements alluding to "young bankers" with "fresh new ideas and outlook," "new talent," "in demand," "energetic," and "future leaders" do not provide "any proof that age discrimination was the standard operating procedure at First Union in its treatment of employees from acquired or merged institutions." *Id.* Having reviewed the "new evidence" provided by Plaintiffs, the Court concludes that Plaintiffs have not provided sufficient evidence that class members were the victims of a single decision, policy, or plan infected by discrimination. As such, the Court maintains the conclusions it made regarding the appropriateness of class certification in this case in the September 4, 2001 Order.

As noted above, Plaintiffs focus on the fact that they have now provided expert reports replete with statistics that allegedly back up their allegations. In the September, 2001

Order, the Court noted that "Plaintiffs proceeding under a pattern and practice theory often introduce statistics to bolster their claim of discrimination." *Id.* at 547 (citing *Hipp,* 252 F.3d at 1228). "While statistical evidence is often useful in pattern and practice cases, its absence is not fatal to the claims." *Id.* Thus, the Court noted that while statistical evidence supporting Plaintiffs' allegations could have been useful, it is not a requirement. The lack of statistical evidence was therefore not the primary reason the Court decertified the class. The Court went on to state that "Plaintiffs have not submitted any statistics that bolster their allegations that age discrimination towards the employees of acquired institutions was the standard operating procedure of FUNB.... Plaintiffs have not presented any expert testimony to support these contentions, leaving the Court with the unavoidable conclusion that these raw employment numbers fail to show, and in fact are contrary to, any evidence of a pattern or practice of discrimination." *Id.* at 548.

In their pending Motions for Leave to Amend and to Intervene, Plaintiffs attempt to remedy the Court's criticisms of their proof. Upon review of the expert reports and statistics submitted by Plaintiffs, however, the Court stands by its conclusion that Plaintiffs have not sufficiently established that age discrimination towards the employees of acquired institutions was the standard operating procedure of FUNB. The Court finds that there are significant questions regarding the reliability of Plaintiffs' reports. For example, Drs. Barnardin and Villanova stated that they "essentially test[ed] the decision-making processes at an aggregated level that does not replicate the actual process of decision-making." (Barnardin 28). It is therefore uncertain that the report can be probative of the actual decision making process at First Union for the mergers and acquisitions that occurred during the relevant time period. Regarding Dr. Lundquist's report, the Court agrees with Defendant that the findings regarding discretion provided hiring managers for particular vacancies may in fact strengthen the contention that Plaintiffs were not subject to the same discriminatory policy. (*See, e.g.,* Lundquist

25). Upon review of the reports, the Court also agrees that contradictory positions taken by the experts, as when Dr. Drogin and Janulaitis include the termination code for early retirement in their analyses of involuntary terminations while Drs. Barnardin and Villanova exclude early retirement from their analysis of lay-off rates, reduces the reliability of the reports. (*See, e.g.,* Drogin 5; Janulaitis 17; Barnardin 5–6). There are also some inconsistencies in the reports. For example, Janulaitis apparently included job titles in some of his "job families" in one year and then included the exact same job title in another job family the next year, which also affects the reliability of the report by Dr. Drogin that used Janulaitis' job family groupings.

Reviewing the findings by Defendants' expert, the Court agrees that there are significant problems with the methodology utilized by Plaintiffs' experts. For instance, the aggregate analyses conducted by Drs. Drogin, Barnardin, and Villanova do not appear to address actual decision-making processes affecting individual employees at First Union. (Haworth 11–13). In Dr. Drogin's branch manager job families at Southeast Bank, in which Plaintiff Stone is included, there are no statistically significant differences in involuntary layoffs between employees over and under the age of 40. (*Id.* 15–16). In addition, the Court notes Dr. Haworth's conclusion that when she performed the same type of involuntary termination analysis as Dr. Drogin (controlling for bank and job family), but accounted for the employee's responsibility center (the department in which the employee worked and the level at which most of the decisions were made), the involuntary layoff decision process at Southeast, as well as all other banks except for Jacksonville Federal, was age-neutral and not statistically significant. (*Id.* at 20–21). Finally, the Court notes that Dennis fails to make concrete conclusions or opinions on important issues material to her report. For example, Dennis states that "since there were fewer forms and written comments compared to the documents reviewed in the *Hyman* case, I have no opinion regarding the decision-making process and the extent to which it was or was not influenced by age stereotyping." (Dennis 23). While the Court notes Plaintiffs' objection that Dennis does "submit opinions on other factors," the Court finds her statement particularly telling.

Upon review of Plaintiffs' expert reports, the Court concludes that they do not alter the Court's analysis or conclusion to decertify the class in its September, 2001 Order. There is nothing in the reports that persuades the Court it should revisit its earlier decision that Plaintiffs cannot move forward collectively pursuant to § 216(b) because the purported class members have brought numerous different types of claims that relate to several different mergers and acquisitions involving different entities and institutions, were employed in different branches and divisions of First Union under several different job titles and classifications, and failed to show sufficient evidence of a pattern or practice of age discrimination to which they were all subjected. The Court earlier concluded that when it applied the factors set forth by the Eleventh Circuit in *Hipp* and *Grayson* the relevant facts in this case weighed heavily in favor of decertification. After the Court decertified the class in September, 2001, the Court denied Plaintiffs' Motion to Reconsider in February, 2002. The expert reports and new developments cited by Plaintiffs, including the filing of additional individual charges of discrimination with the EEOC, are not compelling and do not persuade the Court to alter its earlier decisions.

Moreover, as noted above, the applicable standards for collective actions under Rule 20, governing joinder, and Rule 23, governing class actions, are more stringent than those under § 216(b). After reviewing the parties' arguments, filings, and applicable case law, the Court concludes that Plaintiffs have not sufficiently established that they may move forward on a collective basis under § 216(b), Fed. R. Civ. 20, or Fed.R.Civ.P. 23 (even if Rule 20 or Rule 23 were deemed appropriate mechanisms under which this ADEA action could be moved forward collectively). Accordingly, because Plaintiff's proposed amendment would be futile in this case, the Court will deny Plaintiff's Motion for Leave to Amend to add all Opt–In Plaintiffs. Upon review of Plaintiff's request and the record in

this case, the Court will grant Plaintiff's request to add Wachovia as a Defendant in this case.

### (B) Opt–In Plaintiffs' Motion to Intervene

Opt–In Plaintiffs have also filed a Motion to Intervene. They again argue that "subsequent developments, change in circumstances, and new evidence" warrant the Court's granting the Motion to Intervene despite its September, 2001 Order decertifying the class. Plaintiffs state that the "subsequent developments" include submission of the expert reports discussed above and the fact that "almost all Plaintiffs have now filed individual charges of discrimination with the EEOC."

Given that the Court has already considered these subsequent developments against the standard for collective action under § 216(b), Fed.R.Civ.P. 20, and Fed.R.Civ.P. 23, the one remaining issue to be resolved in adjudicating Opt–In Plaintiffs' Motion to Intervene is to measure these subsequent developments against the standard for intervention under Fed.R.Civ.P. 24. Plaintiffs are moving for intervention under both Fed.R.Civ.P. 24(a) (intervention of right) and Fed.R.Civ.P. 24(b) (permissive intervention). The Court notes that much of Opt–In Plaintiffs' Motion to Intervene reiterates its arguments and summaries regarding their newly filed expert reports and why the Court should allow a collective action despite its determination to decertify the class in September, 2001. Thus, much of the Court's treatment of these arguments in adjudicating Plaintiffs' Motion for Leave to Amend also applies to the adjudication of the Motion to Intervene, particularly its determination on whether Plaintiffs' expert reports "change the landscape" from the facts the Court considered in decertifying the class.

### (i) Intervention of Right Under Fed. R.Civ.P. 24(a)

Fed.R.Civ.P. 24(a) provides for intervention of right stating: "Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

■ First, Plaintiffs cannot rely on 24(a)(1) because there is no operative statute in this action that confers an unconditional right to intervene. *See Mitchell v. McCorstin*, 728 F.2d 1422, 1423 (11th Cir.1984) (holding that man who sought to intervene in age discrimination action under 29 U.S.C. § 201, *et seq.* did not have an unconditional right to intervene under Fed.R.Civ.P. 24(a)(1) granted by 29 U.S.C. § 216).

■ Second, the Eleventh Circuit has specifically enumerated the requirements to intervene as a matter of right under 24(a)(2). "In this circuit, a movant must establish the following requirements to intervene as of right under Federal Rule of Civil Procedure 24(a)(2): (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit." *Purcell v. BankAtlantic Financial Corp.*, 85 F.3d 1508, 1512 (11th Cir.1996) (citation omitted). Moreover, "[o]nce a party establishes all the prerequisites to intervention, the district court has no discretion to deny the motion." *Id.* (quoting *United States v. State of Ga.*, 19 F.3d 1388, 1393 (11th Cir.1994)).

■ After reviewing the parties' arguments and applicable case law, the Court concludes that Plaintiffs' request to intervene as a matter of right rests on the third prong of 24(a)(2) enumerated by the Eleventh Circuit; namely, whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest." Plaintiffs argue that the lack of an

alternative remedy in this matter supports granting intervention. Plaintiffs assert that if separate actions had to be filed by the Opt–In Plaintiffs, judges in subsequent actions would not be bound by this Court's rulings with respect to the opt-in period and the ability of the Opt–In Plaintiffs to piggyback on Plaintiff Stone's timely filed EEOC charge. Consequently, Plaintiffs argue that many Opt–In Plaintiffs would be denied their day in court for redress of age discrimination, and that even though Opt–In Plaintiffs would not be bound by a judgment in Plaintiff Stone's case certain determinations could be relied upon as precedent in the Opt–In Plaintiffs' subsequent lawsuits. Finally, Plaintiffs state that the "sad practical reality" is that many Opt–In Plaintiffs are now in their sixties and seventies and "do not have the luxury of time to begin this lawsuit all over again from square one to redress injuries that occurred ten years ago."

The Court notes, however, that many of the Opt–In Plaintiffs were already past their deadline for filing individual suits prior to opting into this lawsuit. These individuals were allowed to piggy-back their claims to Plaintiff Stone's charge when the class action was conditionally certified. However, after the Court issued its Order decertifying the class in September, 2001, the Opt–In Plaintiffs were in the same situation they would have been but for the class action with the statute of limitations tolled during the pendency of the class action. Plaintiffs have not provided persuasive, binding authority for the proposition that they should receive additional time now when at least some original claims were untimely. Defendants are correct in noting that if the Court logically extended Plaintiffs' argument, any former class member with untimely claims saved by the broad temporal scope of the initial class action could intervene after decertification.

Moreover, the Court is not persuaded by Plaintiffs' argument that the application of *stare decisis* supports their impairment argument. The Court is not provided with specific examples of similar issues of *stare decisis* present here. The case cited by Plaintiffs in support of this argument, *Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir.1996), is inap-

posite. In *Sierra Club*, a suit was brought by farmers seeking to intervene in a suit by an environmental group to enjoin an agency from overpumping an aquifer. The court in that case concluded that the potential *stare decisis* issues supported the impairment prong of intervention because a finding of a threat would have affected contracts that farmers had in place regarding the aquifer. In this case, however, the disposition of an individual age discrimination case, which the Court has held by previous Order is not sufficiently related to putative class members' claims to support collective action, does not present similar issues of *stare decisis*. In their Reply, Plaintiffs state that while other courts "would not technically be bound by any decisions by this Court or this jury that go against Ms. Stone ... any such decisions would be considered persuasive and raise issues of comity." The Court disagrees with this statement, particularly when the facts surrounding the Plaintiffs' claims vary. Moreover, the Court notes that Plaintiffs themselves ultimately concede that other courts "would not be compelled to make the same decision against any of the Opt–In Plaintiffs."

Finally, regarding Plaintiffs' argument that the old age and ill health of Opt–In Plaintiffs supports their argument under the impairment prong, the Court does not agree that any such issues would constitute an impairment of rights under 24(a)(2). Indeed, it is difficult to decipher from the record in this case the extent to which any such issues exist. Plaintiffs cite *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1388 n. 31 (11th Cir.1998) in support of their argument, but in that case the court was not considering whether age and health-related issues constitute impairment of rights under 24(a)(2). The *Armstrong* court simply cited concerns that "plaintiffs and witnesses are at or near retirement age when the litigation commences, and could be in failing health or deceased by the time a final judgment is entered" as a reason for avoiding delay in an age discrimination case by continuing tolling of the statute of limitations. *Id.* In this case, however, Plaintiffs may be delaying the individual adjudication of permissible claims even further by filing motions requesting collec-

tive action even after the Court decertified the class in accordance with § 216(b) and denied a Motion for Reconsideration of the Order. For all these reasons, the Court concludes that Plaintiffs have not sufficiently established that they are entitled to intervention as a matter of right under Fed.R.Civ.P. 24(a)(1) or (2).

### (ii) Permissive Intervention

■ In the alternative, Plaintiffs request that they be allowed to qualify for permissive intervention under Fed.R.Civ.P. 24(b)(1). Fed.R.Civ.P. 24(b) provides, in relevant part, that: "Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." Plaintiffs state that they are entitled to intervene under 24(b)(1) because while § 216(b) does not expressly use the term "intervention," it does provide that individuals may join and be "party plaintiffs" in an ADEA action on condition that they file written consents and are "similarly situated."

The Eleventh Circuit has stated that "[i]f there is no right to intervene under Rule 24(a), it is wholly discretionary with the court whether to allow intervention under Rule 24(b) and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise met, the court may refuse to allow intervention." *Purcell,* 85 F.3d at 1513 (citations omitted).

While Opt–In Plaintiffs may raise issues of law or fact similar to Stone's in some respects, upon review of the parties' arguments, applicable statutes, and case law, the Court concludes that in keeping with its earlier determinations Plaintiffs' claims are not similar enough to warrant exercising the Court's discretion to allow intervention under 24(b). *See Mitchell v. McCorstin,* 728 F.2d 1422, 1423 (11th Cir.1984) (while Eleventh Circuit notes that purported intervenor seeks to raise similar issues of law and fact and "thus passes the first part of the test," the court concludes that the district court did not abuse its discretion in denying intervention stating "it is entirely possible that McCorstin

is not similarly situated to the parties in the *Mitchell* case, and is thus not a party contemplated as an intervenor by 29 U.S.C. § 216.... The district court was in the best position to assess the similarity of the claims and other factors militating for or against intervention. We see no reason to disturb that assessment."). The Court has concluded that Plaintiffs may not move forward with a collective action under § 216(b), Fed.R.Civ.P. 20, or Fed.R.Civ.P. 23. Plaintiffs have provided no compelling rationale to allow a collective action under 24(b), and merely appear to be searching for another rule under which to make arguments the Court has rejected. The Court has concluded that Plaintiffs are not similarly situated as contemplated by the ADEA, and it would be inappropriate for the Court to exercise any discretion allowed under 24(b) to allow these diverse Plaintiffs to move forward collectively under that rule. Likewise, while § 216 may allow intervention of certain parties into an age discrimination case, it does not contemplate intervention by parties who are not sufficiently similarly situated. The Court has already concluded that Plaintiffs are not sufficiently similarly situated, and the Court will thus not allow intervention under § 216. Finally, the Court notes that repeated attempts to create a collective action despite the Court's September, 2001 Order decertifying the class delays the adjudication of Plaintiff Stone's claims, the original party to this action. For all these reasons, the Court will DENY Opt–In Plaintiffs' Motion to Intervene.

### (C) Defendants' Motion for Preservation of Right to Depose Plaintiffs' Experts

Defendants filed a Motion for Preservation of Right to Depose Plaintiffs' Experts in the event that Plaintiffs' Motion for Leave to Amend or Motion to Intervene was granted. Because the Court will deny both motions (with the exception of granting Plaintiff's request to add Wachovia as a Defendant), the Court will DENY, AS MOOT Defendants' Motion for Preservation of Right to Depose Plaintiffs' Experts.

### (D) Plaintiff's Motion for Partial Summary Judgment

Next, Plaintiff filed a Motion for Partial Summary Judgment, requesting that the Court enter summary judgment against Defendants on their first and fourth affirmative defenses. Defendants' first affirmative defense alleged "Plaintiff failed to exhaust her administrative remedies." (Answer 14). Their fourth affirmative defense alleged "Plaintiff's action is barred, in whole, or in part, by applicable statutes of limitation." (*Id.*). The Court denied Defendants' Motion for Summary Judgment on their fourth affirmative defense on May 24, 2001.

### (I) Factual Background [7]

Plaintiff states that the following facts are undisputed and warrant the entry of summary judgment against Defendants' first and fourth affirmative defenses. Plaintiff Stone was terminated from her employment with First Union on October 30, 1992. (Employment Termination Report). She filed an age discrimination complaint with the EEOC in Miami, and the Florida Commission on Human Relations on November 30, 1992. (*Id.*). The EEOC issued a right-to-sue letter dated June 10, 1994 to Plaintiff Stone. (Right to Sue Letter).

Plaintiff asserts that an age discrimination Complaint was filed on September 23, 1994 ninety days after Ms. Stone received the right-to-sue letter. Plaintiff states that although a postal carrier had apparently attempted delivery of the certified letter to her home on June 17, 1994 when Plaintiff was at work, she was never notified prior to June 25, 1994, when she actually received the right-to-sue letter, that the post office had a letter from the EEOC for her. (Certified envelope from EEOC; Stone Aff. ¶¶ 2, 3, 5, 7).

Defendants maintain that there are genuine issues of material fact as to whether Plaintiff Stone filed her age discrimination complaint within 90 days after she received her right-to-sue letter and whether she filed her charge of discrimination within 300 days of the actions of which she complains. (Stone's Response to 7/26/00 Interrogatories ¶ 2; May 24, 2001 Order Denying Defendants' Motion for Summary Judgment with Regard to Plaintiff Arlene Stone's Claims at 8). In addition, Defendants maintain that there are genuine issues of material fact as to whether or not the allegations of Plaintiff's Complaint are within the scope of the charge of discrimination Plaintiff Stone filed with the EEOC and the Florida Commission on Human Relations. (11/30/92 EEOC Charge of Discrimination; Complaint at 7–8).

### (II) Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that

---

**7.** In support of its Motion for Partial Summary Judgment, Plaintiff has filed, *inter alia*, the Employee Termination Report, the right-to-sue letter from the U.S. Equal Employment Opportunity Commission, and Plaintiff Stone's Affidavit. Plaintiff has also filed a Statement of Undisputed Facts pursuant to Southern District of Florida Local Rule 7.5. In opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants dispute some of the allegations contained in Plaintiff's statement and have filed their own Local Rule 7.5 statement. The following facts are derived from the Local Rule 7.5 statements of the parties and corresponding filings before the Court. Any factual disputes between the parties are noted.

there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented, could find for the non-moving party. *See Anderson,* 477 U.S. at 247–51, 106 S.Ct. 2505. In determining whether to grant summary judgment, the district court must remember that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. Finally, the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

### (III) ANALYSIS

The Court will consider Plaintiff's arguments regarding Defendants' fourth affirmative defense first, given that it involves an issue the Court has previously considered in its May, 2001 Order denying Defendants summary judgment.

### (a) Fourth Affirmative Defense

In Defendants' fourth affirmative defense, Defendants allege that Plaintiff's action is barred in whole or in part by the applicable statute of limitations. The ADEA states that "a civil action may be brought under this section by a person [covered by the ADEA] ... within 90 days after the date of the receipt of ... notice [of dismissal or termination of the proceedings by the EEOC]." 29 U.S.C. § 626(e) (emphasis added). As the Court has previously noted in its May 24, 2001 Order denying Defendants' Motion for Summary Judgment, the ADEA's language is entirely consistent with the language set forth in the June 10, 1994 determination letter, in which Plaintiff was told that she must file suit "within 90 days of receipt of this letter." Under the ADEA, if an aggrieved employee lives in a "deferral" state (one, like Florida, that has its own discrimination laws and an agency for enforcement), she has 300 days from the date of the dis-

criminatory act in which to file a charge of discrimination with the EEOC. *See* 29 U.S.C. § 626(d).

Plaintiff argues that the undisputed facts prove that Stone filed her age discrimination complaint within 90 days of her actual receipt at her home of the right-to-sue letter sent by the EEOC. Plaintiff asserts that the only evidence before the Court is Stone's sworn affidavit that prior to her actual receipt of the right-to-sue letter on June 25, 1994, she had never received any notification identifying the EEOC as the sender of a certified letter for her. Thus, Plaintiff concludes that Defendants have no evidence that prior to the actual delivery to her that Stone had ever been placed on notice that the post office had a certified letter from the EEOC to her.

In its previous Order, the Court noted that the Eleventh Circuit had the opportunity to address a case with similar facts to this case in *Zillyette v. Capital One Financial Corp.,* 179 F.3d 1337 (11th Cir.1999). In *Zillyette,* an ADA action brought by an employee against his employer, the defendant brought a motion for summary judgment arguing that the plaintiff failed to file suit within 90 days of receipt of the EEOC determination letter and that the action was thus time-barred. *Zillyette,* 179 F.3d at 1339. The Eleventh Circuit held that the notification required to trigger the commencement of the statutory limitation period should be analyzed on a case-by-case basis, but that certain general principles apply. *Id.* at 1340. Thus, in order to insure against the possibility of manipulation when the time of receipt is uniquely within the plaintiff's control, plaintiffs must assume some minimal responsibility for the orderly and expeditions resolution of their dispute, such as by notifying the EEOC of a change of address or by notifying family members of suitable age and discretion that they should quickly forward any letters. At the same time, the Court has "recognized that when a plaintiff has not known of the receipt of the letter through no fault of his or her own because of circumstances beyond his or her control ... the time must begin to run from the time of actual receipt." *Id.* at 1340–41. In *Zillyette,* the EEOC sent a certified

right to sue letter to the plaintiff. The post office unsuccessfully tried to deliver the letter twice at the plaintiff's home, each time leaving notice that the attempt was made. *Id.* at 1338–39. The notice left by the postal carrier included the name of the sender. *Id.* at 1339. Under these circumstances, the Eleventh Circuit held that the plaintiff had the minimum responsibility of picking up the letter within three days of the first notice, and that the limitation period therefore commenced three days after receipt of the first postal notice. *Id.* at 1342.

In the Court's May, 2001 Order, the Court stated that "there are disputed issues of material fact that preclude the granting of summary judgment to the Defendants. Stone's August 21, 2000 interrogatory response states that the determination letter was mailed by the EEOC on June 13, 1994, that the post office attempted delivery June 17, 1994 while Stone was at work, and that the letter was received when the post office redelivered the letter on Saturday, June 15, 1994." Stone then provided a sworn affidavit "stating that she based the statement that the post office attempted delivery on June 17, 1994, on the notation, 'NRN/L 6606 6–17 KL,' that was handwritten on the envelope, and she stated that she 'never received a notice from the post office that they had attempted to deliver a certified letter from the EEOC to me, or were holding a certified letter from the EEOC to me.'" The Court stated that "even if the Plaintiff's testimony that she never received notice of delivery of any kind from the post office were discounted, which the Court may not do during summary judgment, there would still be no conclusive evidence that the post office provided notice to the Plaintiff indicating that they attempted to deliver a certified letter from the EEOC." As such, the Court concluded that "there are genuine issues of material fact as to when the Plaintiff received notice of the EEOC decision and when the ADEA statute of limitations began to run, and summary judgment is precluded."

■ Now, Plaintiff does not provide significant, persuasive additional evidence establishing that summary judgment can be granted in her favor on this issue, but argues that her affidavit is the only evidence before the Court. The credibility of the evidence regarding when Plaintiff received notice and when the statute of limitations began to run, as discussed above, is a jury function. Defendants are correct that the weight and credibility to be given to affidavits submitted in similar circumstances are for the jury to determine. The Court may not on a summary judgment motion weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir.1987). The trier of fact is to determine which competing version of events is true. Likewise, there is also a genuine issue of material fact as to whether Stone complied with the 300 day limitation period for filing her original charge of discrimination. The parties dispute based on their interpretation of testimony in the record whether the alleged act giving rise to Plaintiff's claim took place more than 300 days before Stone filed her EEOC charge of discrimination. The parties dispute the operative date for purposes of determining the 300 day filing period. While Plaintiff maintains that this is a question of law for the Court to determine on summary judgment, the parties dispute factually when the employer unequivocally communicated to the employee its firm and final decision to impose an adverse employment action. *See Wright v. AmSouth Bancorp.*, 320 F.3d 1198, 1202 (11th Cir.2003) ("The key determination, then, is when Wright [the plaintiff] received unequivocal notice of his termination."). Thus, there are factual disputes at the heart of the parties' arguments that must be weighed by the trier of fact. As the Court has previously concluded, summary judgment on this issue is precluded by genuine issues of material fact that must be considered by the trier of fact in this case. Accordingly, the Court will deny Plaintiff summary judgment on Defendants' fourth affirmative defense.

### (b) First Affirmative Defense

■ In Defendants' first affirmative defense, Defendants allege that Plaintiff has failed to exhaust her administrative remedies. Plaintiff argues that it is undisputed that she filed her charge with the EEOC within 300 days from the discriminatory act.

Plaintiff states that no more was required, and that she should thus be granted summary judgment on Defendants' first affirmative defense. The issues surrounding Plaintiff's Motion for Summary Judgment on Defendants' first affirmative defense are also integral to Defendants' Motion for Partial Summary Judgment, as is explained below.

As the Court noted above, there is a genuine issue of material fact, as disputed by the parties, as to whether Plaintiff met the 300 day requirement. In addition, Defendants argue that Stone's charge of discrimination failed to incorporate all of the alleged adverse actions listed in her Complaint, and that Plaintiff has attempted to vastly expand her claims beyond those she initially filed with the EEOC. Defendants list the following examples of claims that they allege are in addition to those identified in Plaintiff's charge: Plaintiff has alleged that she was "forced to post for other positions within the bank, when younger employees were placed in other positions within the bank and they were not required to go through the posting procedure" (Compl. at ¶ 20); she alleged that "she applied for various job openings within the bank for which she was qualified, including Branch Manager and Sales Manager positions, often at lower salary grades, but was either not interviewed, or was not placed, or was told not to even bother to apply" (Compl. at ¶ 23), and that she "was not informed of a policy for casual attire for Fridays, while younger employees were allowed to dress in slacks and tee shirts" (*Id.*). Defendants maintain that these charges go beyond the charge of discrimination that only mentioned termination, demotion, and transfer. Moreover, Defendants in turn filed their own Motion for Partial Summary Judgment on Plaintiff's claims that she was: (1) forced to post for positions, (2) denied training, (3) not hired for positions for which she applied and was qualified, (4) not informed of a casual Friday policy, and (5) demoted from branch manager to assistant branch manager. Defendants argue that Plaintiff has "apparently chosen to ignore" case law stating that the scope of an employment discrimination claim is limited to the scope of the EEOC investigation. *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.1994) ("A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

Plaintiff counters by stating, *inter alia*, that she also filed an affidavit with the EEOC on November 12, 1992 that complains of applying for posting positions and not being hired, being scheduled to attend a training class to be held February 18, 1992 but being subsequently informed that the training was cancelled for her, and that she applied for various job openings at lower salary grade and position but was not offered any of the positions for which she interviewed. In addition, Plaintiff cites case law that the claimant should not be penalized for EEOC's own errors in countering Defendants' argument that the EEOC did not investigate the training issue. With respect to not being informed of the casual Friday policy, Plaintiff asserts that not every fact alleged in a complaint is an actionable claim, and that the casual Friday allusion is "merely another fact illustrating First Union's corporate culture and the environment to which Ms. Stone was subjected."

Defendants argue that Plaintiff Stone's affidavit does not demonstrate that her allegations regarding forced posting, failure to hire, denial of training, and failure to inform about casual Fridays meet the "like or related" test and thus have sufficient continuity from the charge to the judicial pleading. *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 467 (5th Cir.1970) (Title VII complaint may encompass discrimination like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the commission). Again, however, the Court concludes that the parties dispute, based on disagreements over the record and facts in this case, whether Plaintiff has met the administrative requirements associated with filing her claim. While the parties attempt to frame their disputes as questions of law, resolving these disputes would require the Court to weigh the credibility of often conflicting evidence and testimony as to the actions taken by Plaintiff, the charges made by Plaintiff, and

the extent to which those charges were considered and investigated by the EEOC. For example, while application of the "like or related" test may present a question of law, the parties dispute facts underlying this case and their relation to the charges brought by Plaintiff precluding the Court from determining whether Plaintiff's claims fall under the "like or related" test at this juncture. Thus, determination of this question at this time would require the Court to weigh, for example, the credibility of Plaintiff's affidavit. The evidence in this case is not undisputed. Indeed, the parties dispute not only whether Plaintiff's charges come within the scope of EEOC investigations, but whether the EEOC or Plaintiff is to blame for any lack of investigation. Moreover, the trier of fact in this matter may have to weigh the credibility of the competing documentary evidence presented in support of the parties' conflicting interpretations as to what Plaintiff has claimed, what the EEOC has investigated, and whether Defendants' affirmative defenses have merit. Upon review of the record in this case and the parties' arguments, the Court concludes that there are genuine issues of material fact precluding summary judgment and that a rational trier of fact could find for either Plaintiff or Defendant on both affirmative defenses that are the subject of this motion. As such, the Court will deny summary judgment on both affirmative defenses.

### (E) Defendants' Motion for Partial Summary Judgment

As noted above, Defendants in turn filed a Motion for Partial Summary Judgment on Plaintiff's claims that she was forced to post for various positions, while younger employees were not; that she was denied training for certain positions; that she was not hired for certain positions for which she applied and was qualified; and that she was not informed about a casual Friday policy. Having again reviewed the record in this case, the parties' arguments, and the applicable

summary judgment standard, the Court will deny Defendants' Motion for Partial Summary Judgment regarding these allegations on the same grounds as those enumerated in the section of this Order addressing Plaintiff's Motion for Partial Summary Judgment.[8]

■ Defendants also argue that they are entitled to summary judgment on Plaintiff's claim that she was demoted from branch manager to assistant branch manager in 1991, asserting that the claim is untimely. Defendants state that it is undisputed that Plaintiff Stone alleges that she was demoted from branch manager to assistant branch manager in the fall of 1991. (Stone Dep. at 15; Stone Dep. 2 at 22–23). Defendants also state that it is undisputed that the EEOC determination letter states that Plaintiff Stone was demoted from branch manager to assistant branch manager in September, 1991. As such, Defendants conclude that Plaintiff Stone's claim that she was demoted from a branch manager to an assistant branch manager should be dismissed because it was not filed within the 300–day limitation period under the ADEA. *See* 29 U.S.C. § 626(d). Defendants state that any action allegedly taken against Plaintiff Stone before February 4, 1992 is untimely.

In her Response, Plaintiff Stone disputes Defendants' interpretation of the record. Plaintiff Stone states that Defendants' official response to the EEOC stated "Ms. Stone was advised on February 14, 1992 [within the limitations period] that the position [of ABM] would be eliminated in October [1992], in conjunction with the conversion of the Southeast Bank and First Union systems." (August 1993 Position Statement). Plaintiff asserts that the February, 1992 date is confirmed in Plaintiff Stone's 1992 affidavit to the EEOC, where she testified that "[i]n February [1992] Lewis C. White was transferred to a branch in Pompano and Peter Ameen became manager of the Hollywood Hills branch. Peter informed me that my job would end on 9/30/92 . . . as

---

8. The Court notes that while Plaintiff requests the Court to strike Defendants' Motion for Partial Summary Judgment as untimely, the Court will not do so because the Court's September 27, 2002 Order Rescheduling Trial, Pretrial Dates, and Deadlines established a March 14, 2003 deadline for "all dispositive motions and motions in limine." Defendants filed their Partial Motion for Summary on February 27, 2003, within the applicable deadline.

First Union did not have Assistant Managers in Broward County." (Aff. at 1; Stone 8/95 Depo. at 21). Plaintiff concludes that "[a]lthough the EEOC determination letter states September 1991 is the date Ms. Stone said she was demoted, this clearly conflicts with Ms. Stone's 1992 Affidavit to the EEOC wherein she stated she was first told of the transfer to ABM in November 1991." Plaintiff Stone maintains that she stated that she was "initially placed in a comparable position of Assistant Branch Manager with First Union following the acquisition of Southeast Bank in September 1991," and cites Defendants' April 26, 1994 response to the EEOC in which First Union's vice president stated "Ms. Stone was initially placed in a comparable position of Assistant Branch Manager with First Union." (April 26, 1994 Response). Accordingly, Plaintiff argues that these initial, temporary actions did not start the applicable limitations period. Plaintiff states that the September, 1991 date merely reflects the date of the Southeast Bank acquisition. Plaintiff also cites Defendants' August 6, 1993 position statement to the EEOC regarding Plaintiff's charge, in which First Union's vice president states "Ms. Stone was initially placed temporarily in the position of Assistant Branch Manager at the Hollywood Hills Branch in Broward County" and that her manager, Mr. Ameen, met with Plaintiff Stone to discuss "her temporary responsibilities as Assistant Branch Manager." (August 6, 1993 Position Statement). Finally, Plaintiff cites deposition testimony by First Union–Florida's head of staffing and recruiting who, when asked whether it would be considered a demotion to go from a branch manager position to an assistant branch manager position, stated "my recollection is that it's always our corporate philosophy not to compel people to take positions that were significantly lower in scope than the jobs that they were in" and that "just with the two titles, I wouldn't assume that it was a demotion." (Miyares Depo. at 20, 21–22).

The Court concludes upon a review of the record and the parties' arguments that a determination of whether Plaintiff's claim originated in September, 1991 or February, 1992 for purposes of the applicable statute of limitations is dependent on weighing the conflicting evidence and testimony in this case and interpreting the evidence and testimony to determine when the action allegedly taken against Plaintiff occurred for purposes of her claim and the applicable statute of limitations. Thus, upon application of the summary judgment standard, the Court concludes that there are disputed issues of material fact in the record in this case as to when the alleged action occurred for which Plaintiff brings her demotion claim. Therefore, the Court will deny Defendants' Motion for Partial Summary Judgment.

**(F) Magistrate Judge's Supplemental Report and Recommendation**

On March 21, 2003, U.S. Magistrate Judge Bandstra issued a Supplemental Report and Recommendation concerning Plaintiff's Supplement to Plaintiff's February 11, 2002 Appeal of Report and Recommendation on Plaintiff's Motion for Sanctions for Discovery Abuses, which was filed on May 10, 2002.

Plaintiff asserts in the supplement that new evidence has been discovered regarding Defendants' alleged destruction of documents pertinent to the determination of Plaintiff's Motion for Sanctions previously addressed in the Report and Recommendation dated October 31, 2001. The Court referred Plaintiff's supplement to the Magistrate Judge on May 16, 2002 to issue a Supplemental Report and Recommendation regarding (1) whether new evidence has been presented regarding the destruction of documents, and (2) whether any recommendations in the October 31 Report and Recommendation should be modified pursuant to any new evidence. Magistrate Judge Bandstra held a hearing on the matter on August 28, 2002, at which he required further briefings from the parties. Following a review of the pleadings, the case file, applicable law, and the oral argument of counsel, Magistrate Judge Bandstra again recommended that Plaintiff's Motion for Sanctions based on alleged destruction of evidence be denied.

In Plaintiff's supplement, Plaintiff presents "new evidence" in the form of deposition testimony of present or former First Union

hiring personnel and discovery responses recently reviewed from First Union that indicate that First Union attorneys failed to give written or verbal instructions to First Union employees with respect to the preservation of documents in this case prior to 1998, and then only with respect to merger-related documents not necessarily related to employment decisions made by First Union in connection with such mergers. In the second supplement to the appeal, Plaintiff attempts to document Defendants' alleged destruction of documents with deposition testimony of several First Union hiring personnel, additional discovery responses from First Union, and other materials obtained during discovery in this case.

In response, Defendants argue that no employment-related documents were ever destroyed in violation of any legal obligation to maintain such documents either before or after the filing of this lawsuit. Defendants also argue that Plaintiff mischaracterizes deposition testimony of First Union managers, distorts the factual record of this case, urges erroneous legal conclusions, ignores precedent, and attempts to confuse the issues of the case. Defendants assert that Plaintiff presents no "new evidence" on this matter demonstrating any improper destruction of evidence by First Union personnel that would require the Court to reach a result contrary to prior conclusions on the Motion for Sanctions.

In the Supplemental Report and Recommendation, Magistrate Judge Bandstra states that upon full review of the arguments, law, and record in this case he reaches the same findings and conclusions contained at pages 9–14 of the October 31 Report and Recommendation (DE # 1014). In that Report and Recommendation, Magistrate Judge Bandstra found that Plaintiff failed to produce sufficient evidence of the discovery abuses they allege or any other legal requirement for the preservation of documents relevant to the case. The Magistrate Judge also concluded that Plaintiff's "new evidence" provides no basis for revision or modification of prior rulings on this matter.

Upon review of the Supplemental Report and Recommendation, Plaintiff's Objection, Defendant's Response, Plaintiff's Supplement, Plaintiff's Reply, Plaintiff's "new evidence," the record in this case, the parties' arguments at oral argument, and applicable case law, the Court agrees with the Magistrate Judge's Recommendation for all the reasons cited by him in his Supplemental Report. Plaintiff has not sufficiently established any legal or factual basis to grant the Motion for Sanctions. Therefore, the Court will ADOPT AND AFFIRM the Magistrate Judge's Supplemental Report and Recommendation, and DENY Plaintiff's Motion for Sanctions for Discovery Abuses (DE # 1112).

Accordingly, it is hereby **ORDERED AND ADJUDGED:**

1. Plaintiffs' Motion for Leave to Amend Complaint (DE # 1198) is DENIED, IN PART, and GRANTED, IN PART. Plaintiffs' Motion for Leave to Amend Complaint is granted to the extent that Wachovia Corporation may be added as a Defendant in this action. The stay currently pending in this matter will remain in effect until the end of the business day on Tuesday, September 30, 2003.

2. Opt–In Plaintiffs' Motion to Intervene (DE # 1207) is DENIED.

3. Defendants' Motion for Preservation of Right to Depose Plaintiffs' Experts (DE # 1217) is DENIED, AS MOOT.

4. Plaintiff's Motion for Partial Summary Judgment (DE # 1219) is DENIED.

5. Defendants' Motion for Partial Summary Judgment (DE # 1228) is DENIED.

6. The Court ADOPTS AND AFFIRMS the Supplemental Report and Recommendation of U.S. Magistrate Judge Ted E. Bandstra (DE # 1242) and thus DENIES Plaintiff's Motion for Sanctions for Discovery Abuses (DE # 1112).

7. The Agreed Motion to Reschedule Mediation (DE # 1232) is GRANTED.

8. The Clerk of the Court is directed to remove the above-specified motions from the six month list.

9. The parties are ORDERED to comply with all relevant deadlines to move this matter forward.